No. 53,882

STATE OF KANSAS, *Appellee,* v. DANNY EUGENE CRUMP, *Appellant.*

(654 P.2d 922)

Opinion filed December 3, 1982.

*Thomas A. Hamill,* of Hamill, Lentz, Neill & Dwyer, of Mission, argued the cause and was on the brief for appellant.

*Dennis W. Moore,* district attorney, argued the cause and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: Danny Eugene Crump appeals from his convictions by a jury of one count of premeditated murder and five counts of felony murder (K.S.A. 21-3401), three counts of aggravated battery (K.S.A. 21-3414), one count of arson (K.S.A. 21-3718), and one count of attempted arson (K.S.A. 21-3718, 21-3301). Defendant asserts six points on appeal, none of which warrant reversal. We affirm.

The defendant was convicted of using a booby-trap bomb in killing his ex-wife, Diane Post Crump, and five members of her family: her father and mother, Robert and Norma Jeanne Post, a sister, Susan Post, and two brothers, Richard and James Post. The blast destroyed the Post home and injured David Post, Craig Weber and Randy Crump. There had been hard feelings between the Post family and Crump for some time as a result of his troubled marriage and divorce from Diane and the bitter fight over custody of their son Randy.

The State's case consisted of evidence that sometime around two o'clock in the morning, September 20, 1980, the defendant and his girlfriend, Sandra Goold, took a dynamite bomb to the Post residence and left it on the hood of one of the family cars parked in the driveway. The bomb was rigged in a cardboard box addressed to Diane. Around nine o'clock that morning, a neighbor observed someone from the Post house looking at the package on the car. That person then took the package inside the house. Shortly thereafter the explosion occurred.

Craig Weber, who survived the blast, testified that he and his friend, James Post, had entered the kitchen of the home for a drink of water just before the explosion. He said they observed Diane, her mother, father, Richard and Susan, seated around the table with the package sitting in front of them. When Diane attempted to lift off the lid, the bomb exploded leaving dismembered corpses and a heap of rubble where the Post home formerly stood.

The State's case was established primarily by the confession of Danny Crump and the testimony of Sandra Goold. Ms. Goold had been granted immunity in exchange for her testimony.

The defendant denied any involvement in the crime and testified that he observed Sandra Goold and one Charles Price placing a mysterious package on one of the Post cars about three o'clock on the morning of the fatal day. With testimony that filled well over two hundred pages of the transcript, the defendant related in minute detail the events he claimed to have observed on the evening of September 19 and morning of September 20. The jury, however, evidently found more credibility in the State's case and convicted the defendant on all eleven felony counts.

Appellant's first point on appeal is that the trial court erred in failing to suppress his confession. He asserts that the statement was a result of mental coercion and not a product of his free will. A *Jackson v. Denno* hearing was held by the trial court. Testimony at the hearing disclosed that on the afternoon of September 20, police officers located and questioned the defendant as a suspect in the bombing. The defendant voluntarily submitted to being swabbed for explosive residue and drove himself to the police station to submit to police interrogation. It is undisputed that the defendant was required to wait some five hours in the interview room until a detective, who had been investigating the crimes, arrived to question him. He was then questioned for two and one-half hours. He says he was not allowed to leave nor make a telephone call. He claims to have been interrogated by an angry and aggressive detective. He also presented psychological testimony from Dr. Robert Schulman to the effect that he was an individual who does not handle stress or anxiety well and that he would say almost anything to avoid the emotional impact of the interrogation. The doctor was of the opinion that the confession was not voluntarily given. The State, on the other hand, submitted expert testimony in rebuttal to that of the defendant's witness.

The State points out that, although the defendant spent nearly eight hours at the police station under suspicion, he at no time asked for a lawyer or otherwise asserted his right to remain silent. It is undisputed that he was adequately advised of his *Miranda* rights and that he waived them more than once by signing written waiver forms, although he later contended he really didn't understand his rights. The State's psychological expert concluded

that the defendant was capable of protecting himself during the interrogation by the police. He was not coerced. Unfortunately, the trial court failed to make any findings in overruling the motion to suppress the statement given by the defendant and allowing the confession to be admitted in evidence. However, inherent in the court's ruling is the finding that the statement was freely, voluntarily and knowingly given. In *State v. Kanive,* 221 Kan. 34, 558 P.2d 1075 (1976), we held:

"When a trial court conducts a full pre-trial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily and knowingly given and admits the statement into evidence at the trial, the appellate court should accept that determination if it is supported by substantial competent evidence." Syl. ¶ 5.

See also *State v. Lilley,* 231 Kan. 694, 647 P.2d 1323 (1982). We have examined the record and find the ruling of the trial court is supported by substantial competent evidence.

Appellant's second point is that the trial court should have stricken Count I of the amended information because it alleged in the alternative that the murder of Diane was either premeditated murder or felony murder and was therefore duplicitous. In *State v. Lamb,* 209 Kan. 453, 497 P.2d 275 (1972), this court held:

"[W]here an information charges a defendant with murder in the first degree on both theories — the premeditated killing *and* killing while in the perpetration of a felony — a defendant is not prejudiced because the state has apprised him that it is proceeding on both theories of first degree murder, and that it intends to produce evidence on both theories." Syl. ¶ 9.

In *State v. Jackson,* 223 Kan. 554, 575 P.2d 536 (1978), we said, in commenting upon our holding in *Lamb:*

"Thus, the state is *not* required to elect between the murder theories charged as long as the defendant is fully apprised of the charges against him." p. 557.

Appellant's second point lacks merit.

Next, appellant asserts that it was error for the court not to dismiss the five counts of felony murder on the grounds the felony murder provision of K.S.A. 21-3401 is unconstitutional. The appellant relies on two Michigan cases, *People v. Wilder,* 411 Mich. 328, 308 N.W.2d 112 (1981), and *People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304 (1980), to support his assertion that our statute is unconstitutionally broad, vague and constitutes double jeopardy in violation of the Fifth and Sixth Amendments to the U.S. Constitution. The Michigan cases are not persuasive.

They dealt with the common law definition of the crime of felony murder and the Michigan constitutional provisions and not with a specific statutory enactment as set forth in K.S.A. 21-3401. It has long been the law in Kansas that the underlying felony to support a conviction of murder in the first degree must be one that is inherently dangerous to human life. Appellant's position appears to be that such a classification of the underlying felony is impermissibly broad and vague. In *State v. Underwood,* 228 Kan. 294, 615 P.2d 153 (1980), we said:

"Theoretically the elements of malice, deliberation and premeditation which are required for murder in the first degree are deemed to be supplied by felonious conduct alone if a homicide results. It is not necessary for the prosecutor to prove these elements or for the jury to find such elements of the crime. They are established by proof of the collateral felony. *State v. Wilson,* 220 Kan. 341, ¶ 2, 552 P.2d 931 (1976). Therefore, to support a conviction for felony murder all that is required is to prove that a felony was being committed, which felony was inherently dangerous to human life, and that the homicide which followed was a direct result of the commission of that felony. *State v. Bey,* 217 Kan. 251, 260, 535 P.2d 881 (1975).

"The felony murder rule has logic based on the theory of transferred intent. The malicious and premeditated intent of committing the inherently dangerous collateral felony is transferred to the homicide to supply the elements of malice and premeditation without further proof. Consistent with this thinking, most courts require that the collateral felony be inherently dangerous for the felony murder rule to be applicable. 2 Wharton's Criminal Law § 146, p. 210 (14th ed. 1979)." pp. 302-303.

In *State v. Goodseal,* 220 Kan. 487, 553 P.2d 279 (1976), the court stated:

"The felony murder rule represents a long standing policy of this state. We have already indicated its rationale — to furnish an added deterrent to the perpetration of felonies which, by their nature or the attendant circumstances, create a foreseeable risk of death. 'The legislature, acting in the exercise of the police power of the state, is empowered to enact measures in furtherance of the public welfare and safety, and its enactments in such areas are not to be judicially curtailed where they reasonably relate to the ends sought to be attained. Classification honestly designed to protect the public from evils which might otherwise arise are to be upheld unless they are unreasonable, arbitrary or oppressive' (*State v. Weathers,* 205 Kan. 329, Syl. para. 1 & 2, 469 P.2d 292). *The felony murder rule, designed as it is to protect human life, represents sound public policy, is reasonably related to the end sought to be accomplished and is not constitutionally impermissible."* pp. 493-494. (Emphasis added.)

The felony murder statute, as interpreted and applied requiring the underlying or collateral felony to be one which is inherently dangerous to human life, is neither overly broad nor vague and

does not violate the Sixth Amendment or the due process clause of the Fifth Amendment.

Appellant's attack on the statute as subjecting him to double jeopardy under the Fifth Amendment is based upon the decision of the Michigan court in *Wilder*. We do not find the rationale of *Wilder* to be persuasive. Our statute creates two classes of first-degree murder: premeditated murder and felony murder. The crime of first-degree murder resulting from the perpetration of a separate and distinct felony, which is inherently dangerous to human life, is a separate and distinct statutory crime from that constituting the underlying felony. In such cases there is no constitutional prohibition against prosecution for both crimes and a conviction of both crimes does not constitute double jeopardy as banned by the Fifth Amendment. In *State v. Ragan,* 123 Kan. 399, 256 Pac. 169 (1927), we held:

"In criminal cases the ultimate test applied in determining the validity of a plea of former conviction or former acquittal is identity of offenses, and it is not necessarily decisive that the two offenses may have some material fact in common." Syl. ¶ 2.

The same rule applies when a defendant contends that he has been placed in double jeopardy by the prosecution of two crimes in the same trial. See *Wagner v. Edmondson,* 178 Kan. 554, 290 P.2d 98 (1955). The jury in the present case was instructed that the felony murder charges would be supported upon a finding of guilty of any of four underlying felonies; the premeditated murder of Diane, second-degree murder of Diane, arson or attempted arson. Obviously, the underlying felonies meet the test of separate and distinct offenses from the charges of felony murder. For an interesting and informative article on the history and evolution of the felony murder doctrine in Kansas, see Note, *Felony Murder in Kansas - The Prosecutor's New Device: State v. Goodseal,* 26 Kan. L. Rev. 145 (1977). Appellant's constitutional attacks upon the statute are without merit.

Appellant's next point is that the trial court committed error in allowing certain gruesome and gory photographs in evidence. The photographs portray the devastation caused by the bomb blast. One photograph is of the dismembered trunk of Diane. Her face was obliterated. Other photographs show her lower limbs in various locations on the premises. Another photograph shows the corpse of her father and another shows his perforated heart

outside of his body. The defendant argues that these photographs are gruesome and unduly prejudiced his case by inflaming the jury against him.

At the beginning of the trial, the State and the defendant stipulated that the cause of all of the deaths was a point-source explosion. Thus, the defendant argues that the photographs really added nothing to the State's case and were introduced by the State solely in an attempt to prejudice and inflame the jury. On the contrary, we said in *State v. Campbell,* 210 Kan. 265, 276, 500 P.2d 21 (1972), that even when the defendant concedes the victim's death and the cause of death, it is incumbent upon the State to prove all the elements of the crime charged.

We have faced this issue many times and have often said that so long as the photographs are relevant and help the jury to better understand the testimony and other evidence in the case, they are not inadmissible simply because they portray the macabre result of a violent and heinous crime. *State v. Johnson,* 231 Kan. 151, 643 P.2d 146 (1982). The photographs were utilized by the pathologist to explain his testimony and were also relevant to show, by the extent of the damage, the wilful and purposeful nature of the defendant's acts and the violent nature of the victims' deaths. The admission of such evidence is discretionary with the trial court and no abuse of that discretion has been shown.

For his next point on appeal, the appellant asserts the trial court committed error in failing to grant a change of venue. Due to the nature and results of the crimes committed, the news media treatment and coverage was extensive. The court delayed his ruling on the motion to change venue until after the voir dire examination of the jury so as to be in a position to determine whether a fair and impartial jury could be selected at which time the motion was overruled.

The law concerning a change of venue in a criminal action has been clearly set out in a number of cases. In *State v. Porter,* 223 Kan. 114, 574 P.2d 187 (1977), we said:

"A change of venue in a criminal case lies within the sound discretion of the trial court. [Citations omitted.] The burden of proof is cast upon defendant to show prejudice in the community which will prevent him from obtaining a fair and impartial trial. [Citations omitted.] Media publicity alone has never established prejudice per se. Defendant must show prejudice has reached the community to the degree it is impossible to get an impartial jury." p. 117.

As the State points out, only ten potential jurors were dismissed by the court for cause. Of those, only six were related to feelings generated by pretrial publicity. In reviewing the record of this case, it is apparent that the trial judge was extremely careful to excuse veniremen and women at even the slightest hint of possible prejudice or conflict of any kind. The judge did not attempt to press anyone into service or in any way to shake their convictions. He made a commendable effort to ensure that this defendant was tried before an impartial jury. The court did not abuse its discretion in denying the motion.

For his final argument on appeal, the defendant contends that the trial court erred in refusing to give his requested instructions on lesser homicides. As we said in *State v. Foy,* 224 Kan. 558, 582 P.2d 281 (1978), when a murder is committed during the commission of a felony it is not necessary to include lesser homicide instructions when proof of the underlying felony is strong as it was in this case. As to Count I, dealing with the death of his ex-wife, defendant did have the benefit of an instruction on second-degree murder. Defendant denied that he was in any way responsible for the explosion which resulted in the six deaths. The evidence and the defense asserted in the present case would not warrant the giving of instructions on lesser degrees of homicide.

The judgment is affirmed.